**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff–Appellant,**

v.

**The CITY OF NEW YORK, Defendant–Appellee.**

**No. 1271, Docket 89–7271.**

United States Court of Appeals, Second Circuit.

Argued June 19, 1989.

Decided Aug. 16, 1989.

Stephen C. Rogers, Washington, D.C. (Dennis M. Moore, Nat. R.R. Passenger Corp., Washington, D.C., James G. Greilsheimer, Janis Ettinger, Stroock & Stroock & Lavan, New York City, of counsel), for plaintiff-appellant.

Renee Modry, Asst. Corp. Counsel, City of New York, New York City (Peter L. Zimroth, Corp. Counsel of the City of New York, Joseph I. Lauer, Anne M. Schuman, Asst. Corp. Counsel, New York City, of counsel), for defendant-appellee.

Before MESKILL, PIERCE and MAHONEY, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from an order entered in the United States District Court for the Southern District of New York, Conner, *J.*, granting summary judgment to defendant-appellee, the City of New York. The district court's decision is reported at 695 F.Supp. 1570 (S.D.N.Y.1988). Plaintiff-appellant National Railroad Passenger Corp. (Amtrak), a federally subsidized corporation, filed a complaint in the district court requesting a declaration that it is exempt from the payment to the City of money due under two contracts (or "certificates") dating from the early twentieth century between the City and Amtrak's predecessors in interest. Amtrak claimed this exemption under 45 U.S.C. § 546b (1982).

The district court held that Congress intended to exempt Amtrak only from the payment of taxes, and that the exemption was intended to extend only as far as the federal government is exempted from the payment of taxes. Because the court concluded that the payments in question were not taxes from which the government would be exempt, it granted summary judgment to the City. Amtrak appeals from this decision.

We affirm.

## BACKGROUND

In 1902, the Board of Rapid Transit Railroad Commissioners for the City of New York entered into an agreement with the Pennsylvania, New York and Long Island Railroad Co. (the Penn. Railroad) which granted the Penn. Railroad certain rights to use City property. This agreement (the 1902 certificate) allowed the Penn. Railroad "to construct and operate its railroad along the said routes and under lands, streets, avenues, waters, rivers, highways and public places in the City." In return for this privilege, the Penn. Railroad was to pay an annual "sum or rental" to the City. The amount of money due each year could be recalculated every twenty-five years. The City retained the right to use the railroad's tunnels for the placement of communication wires. The certificate described the agreement as a "franchise" and it has been

amended several times. Amtrak is the successor in interest to the Penn. Railroad.

The second certificate was agreed to in 1907 by the Board of Rapid Transit Railroad Commissioners and the New York Connecting Railroad Co. (the NY Railroad). This certificate (the 1907 certificate) granted the NY Railroad the right to build and maintain tunnels and facilities under city streets and other publicly owned land. Similar to the terms of the 1902 certificate, the 1907 certificate specified that the NY Railroad would pay the City "certain sums or rentals," the amount of which was to be redetermined every twenty-five years. As did the 1902 certificate, this certificate described the nature of the transaction as the granting of a franchise to the railroad. The rights granted by the 1907 certificate were granted "in perpetuity," and the payments to be made by the NY Railroad were designated as "over and above all taxes lawfully levied upon the property of the [NY Railroad]." The City again reserved the right to use railroad tunnel space for the installation of communication lines. This certificate has also been amended. Amtrak is the successor in interest to the NY Railroad.

In 1981, Congress passed a law prohibiting federal Amtrak subsidies from being used to pay state or local taxes during fiscal year 1981–82. Department of Transportation and Related Agencies Appropriation Act, 1982, Pub.L. No. 97–102, tit. I, 95 Stat. 1442, 1451 (1981). In 1982, Congress enacted legislation granting Amtrak an exemption from "taxes or other fees" assessed by state or local authorities, retroactive to October 1, 1981. Supplemental Appropriations Act, 1982, Pub.L. No. 97–257, tit. I, ch. XII, 96 Stat. 818, 852–53 (codified at 45 U.S.C. § 546b (1982)). It is this section, section 546b, that Amtrak alleges exempts it from having to make payments to the City under the 1902 and 1907 certificates.

After the City sent Amtrak several bills in the 1980s for "railroad privilege[s]" and "railroad franchise[s]" under the certificates, and after Amtrak refused to pay these bills, Amtrak and the City entered into an agreement governing their future rights and obligations under the certificates. They agreed to litigate the issue whether Amtrak was exempt from making the contested payments to the City.

Subsequently, Amtrak filed suit in the Southern District of New York, requesting a declaration that section 546b exempts it from the payments specified by the 1902 and 1907 certificates and an injunction against the City's collection of these payments. The City never filed an answer to Amtrak's complaint, but it apparently made a motion for summary judgment at a pretrial conference held before Judge Conner.[1] Based on a joint statement of facts submitted by the City and Amtrak, Judge Conner granted the City's motion.

The district court first determined that the plain language of section 546b did not expressly include or exclude payments of the type required by the certificates. After reviewing the legislative history of section 546b, it concluded that Congress intended to exempt Amtrak from state and local taxation to the same extent that the United States is exempt from state taxation. 695 F.Supp. at 1573. Under the law of sovereign tax immunity, the district court held that the City could collect the payments at issue from Amtrak "if the payments (1) do not discriminate against federal functions; (2) are based on a fair approximation of Amtrak's use of City property; and (3) do not exceed the total cost to the City of the benefits supplied to Amtrak." *Id.* at 1575. Applying this test, the district court determined that the payments are not taxes from which Amtrak is exempt under section 546b. In addition, the court found that the payments were not "other fees" within the meaning of that section. *Id.* at 1577.

The court entered an order to this effect, from which Amtrak appeals.

---

1. Judge Conner's order refers to cross-motions by the parties for summary judgment. However, no such motions or notices of motion are listed on the district court docket sheet. Presumably, the motions were made at one of the two pretrial conferences held by Judge Conner.

## DISCUSSION

### A. *The Appeal from the Order*

■ Amtrak's appeal is taken from an "order" entered in the district court. In most circumstances, however, a separate document denominated a "judgment" must be entered, and an appeal should be taken from that document. *See* Fed.R.Civ.P. 58, *Kanematsu–Gosho, Ltd. v. M/T Messiniaki Aigli*, 805 F.2d 47, 48–49 (2d Cir.1986) (per curiam) (rejecting rule that a "separate order ... could constitute the separate document required"). However, where the parties have consented to the appeal of an order without the entry of a separate judgment, a court of appeals has jurisdiction to hear the appeal. *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 386, 98 S.Ct. 1117, 1120, 55 L.Ed.2d 357 (1978) (per curiam) (parties can waive requirement of separate entry of judgment); *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1201 (2d Cir.1987) ("a one-sentence order denying a motion satisfies the separate-document requirement"); *Finn v. Prudential–Bache Sec., Inc.*, 821 F.2d 581, 585 (11th Cir.1987) (where order granting summary judgment was entered, but no document titled "judgment" was entered, and appellee did not object to appeal, appellate jurisdiction existed); *see also Fennell v. TLB Kent Co.*, 865 F.2d 498, 499 n. 1 (2d Cir.1989) (lack of separate entry of judgment not fatal to appeal); *John Doe Corp. v. John Doe Agency*, 850 F.2d 105, 107–08 (2d Cir.1988) (failure to enter separate judgment did not prevent exercise of jurisdiction where district court contemplated no further proceedings), *cert. granted,* — U.S. —, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989); *United States v. Benevento*, 836 F.2d 129, 130 n. 1 (2d Cir.1988) (per curiam) (opinion and order representing final decision in case sufficient to satisfy requirements of Rule 58).

■ In this case, the parties have clearly consented to the appeal, as one party brought the appeal and the other has not contested our jurisdiction. Furthermore, there are no issues remaining for resolution in the district court; Judge Conner's order was intended to be the final action in this case. We therefore have jurisdiction to hear this appeal.

### B. *Summary Judgment*

Summary judgment is proper under Fed. R.Civ.P. 56(c) when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Of course, the determination of which facts are material depends on the legal standards governing any particular issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Greater Buffalo Press, Inc. v. Federal Reserve Bank*, 866 F.2d 38, 42 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989). All inferences must be drawn in favor of the party opposing the motion and only if "no reasonable trier of fact could find in favor of the nonmoving party" should summary judgment be granted. *H.L. Hayden Co. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). In other words, only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *H.L. Hayden*, 879 F.2d at 1012. Our review of a grant of summary judgment is *de novo. Id.* at 1011–12.

### C. *The Merits*

#### 1. *The Nature of the Exclusion*

■ Section 546b reads, in pertinent part:

Notwithstanding any other provision of law, [Amtrak] shall be exempt from any taxes or other fees imposed by any State, political subdivision of a State, or local taxing authority which are levied on [Amtrak], or any railroad subsidiary thereof, from and after October 1, 1981 ... *Provided, however,* That notwithstanding any provision of law, [Amtrak] shall not be exempt from any taxes or other fees which it is authorized to pay as of September 10, 1982.

45 U.S.C. § 546b. On their face, the words "any taxes or other fees" do not have a

readily discernible meaning. Their ambiguity combined with the use of the verbs "imposed" and "levied," words normally applied to taxes and non-consensual fees, require us to look to the legislative history of section 546b to establish the intent behind the enactment of that section. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

In a House of Representatives report on a preliminary version of the provision eventually enacted as section 546b, the Committee on Energy and Commerce reported that it believed that "Amtrak should be exempt from the payment of state and local taxes." H.R.Rep. No. 81, 97th Cong., 1st Sess. 19 (1981). In discussing this provision, the Committee quoted from a United States Department of Transportation (DOT) report that had reached the same conclusion. The DOT report and the Committee report were addressed exclusively to the subjects of taxes as well as "fees" that had the effect of taxes. *See id.* at 19–21. Thus, the Committee cited the following non-exclusive list of payments from which Amtrak would be exempt: " 'property taxes, income and franchise taxes, sales taxes, gross revenue taxes, fuel taxes, licenses and other fees, to the same extent as the United States is exempt from the payment of such taxes or other fees.' " *Id.* at 21. The report expressly stated, however, that "it is not the Committee's desire to exempt Amtrak from the payment of fees for services used, such as water and sewer, just as the United States is not exempt from the payment of such fees." *Id.*

The Committee also cited the DOT report in discussing the source of congressional authority for enacting such a provision. According to the DOT, an exemption for Amtrak from taxes and other fees would be authorized by the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, and the Supremacy Clause, U.S. Const. art. VI, cl. 2, of the Constitution. *Id.* Detailing the power granted by these provisions, the DOT report discussed congressional ability to provide immunity from taxation. The Committee report cited no authority beyond that allowing Congress to establish tax immunities as authority for the enact-

ment of an exemption for Amtrak. *Id.* at 21–22. The Senate, in considering the bill that gave Amtrak a temporary exemption from taxes, also cited the DOT report as support for its conclusion that Amtrak should not use federal funds, which are received through the imposition of federal taxes, to pay local taxes. S.Rep. No. 253, 97th Cong., 1st Sess. 106 (1981).

Subsequently, in considering the legislation that became section 546b, the Senate Committee on Appropriations stated that one of the reasons behind the creation of a permanent state and local tax exemption for Amtrak was that "there are many parts of the country which would gladly pay an amount equal to local or State taxes owed by Amtrak in order to have the benefit of Amtrak service." S.Rep. No. 516, 97th Cong., 2nd Sess. 170 (1982). Thus, a tax exemption would prevent Amtrak from paying state and local taxes with money received from the collection of federal taxes and would not be inequitable to those localities because they would receive the benefit of Amtrak's services.

This background demonstrates that the reason Congress chose to use the words "imposed" and "levied" in section 546b was that it believed that the bill it was considering applied to taxes and other fees that could be construed as taxes—*i.e.,* fees unilaterally imposed by a sovereign on its residents. *See National Cable Television Ass'n v. United States,* 415 U.S. 336, 340, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974). There is no evidence in the legislative history of section 546b that Congress' intent was to exempt Amtrak from all payments to state and local governments. To the contrary, Congress repeatedly included in reports statements that indicate that its focus was on taxation, and not payment for municipal services. Nothing in either the language of section 546b or its legislative history can be interpreted so broadly as to imply that Congress intended to enact more than a state and local tax exemption.

In its reports, Congress reiterated time and again that it was dealing with a proposed "tax" exemption for Amtrak. It specifically stated that the authority upon

which it based its legislation was those sections of the Constitution that had been construed to give it the power to "legislate the immunity of Congressionally established ... corporations from state taxation." H.R.Rep. No. 97–81 at 21. It noted the illogical nature of paying one sovereign's taxes with money received from another sovereign's imposition of taxes. It stated its intention that Amtrak pay for benefits such as sewer and water services. Finally, it used the word "fee" only in conjunction with the word "tax." There is no suggestion that fees that are different from taxes were to be included in the section 546b exemption. Nor is there an indication that Congress intended Amtrak to be able to use property, whether private or public, without paying for the right to use it.

The language used in section 546b is consistent with the distinction between taxes and non-taxes as it has developed in the courts. Just as Congress directed its attention to taxes and to fees that are, in effect, taxes, the courts have recognized that the label applied to an assessment by a state or local government does not determine whether the assessment is a tax or a non-tax. Rather,

> [t]axation is a legislative function, and [a legislature] ... may act arbitrarily and disregard benefits bestowed by [a g]overnment on a taxpayer and go solely on ability to pay.... A fee, however, is incident to a voluntary act, *e.g.,* a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station.

*National Cable,* 415 U.S. at 340, 94 S.Ct. at 1149; *see also Skinner v. Mid–America Pipeline Co.,* — U.S. —, ——-—, 109 S.Ct. 1726, 1731–35, 104 L.Ed.2d 250 (1989); *Spiers v. Ohio Dep't of Natural Resources (In re Jenny Lynn Mining Co.),* 780 F.2d 585, 588–89 (6th Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); *County Sanitation Dist. No. 2 v. Lorber Indus. (In re Lorber Indus.),* 675 F.2d 1062, 1066–67 (9th Cir. 1982); *City of Vanceburg v. Federal Energy Regulatory Comm'n,* 571 F.2d 630,

644–46 (D.C.Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978).

As to Congress' intent that Amtrak be exempt from taxes to the same extent that the federal government is, *see National R.R. Passenger Corp. v. Commonwealth of Pa. Pub. Util. Comm'n,* 848 F.2d 436, 440 (3d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988); H.R. Rep. No. 97–81 at 21, we note that the federal government is not exempt from the payment of rents to municipalities. While in some cases the government does not pay more than a minimal amount for the use of certain land and facilities, it does pay rent for the use of others' property. In fact, the federal government rents land from New York City, including property necessary to support the use and maintenance of bridges over streets in Manhattan, "conduits, cables, manholes and light poles" associated with LaGuardia Airport in Queens, New York and an instrument landing system facility at John F. Kennedy International Airport in Queens. There is simply no policy based on governmental tax immunity that exempts the federal government from paying rent.

Based on the legislative history and the circumstances surrounding the enactment of section 546b, we conclude that Congress intended to exempt Amtrak only from the payment of taxes and fees that are the equivalent of taxes. It did not intend to exempt Amtrak from the payment of fees for the use of city services or property.

## 2. *The Nature of the Payments*

We now examine the nature of the payments provided for in the certificates. Although their descriptions of the payments are not dispositive, the certificates themselves describe the relationship between the City and Amtrak as a "franchise." They describe the payments to be made by Amtrak as "rent." They recite that these payments are in consideration for Amtrak's use of City property. The 1907 certificate states that the payments are over and above the amount of taxes due to the City. These facts all support a conclusion that

the certificates are leases and that the payments are rent.

Nothing in the certificates indicates that the payments are taxes. The amount due was subject to renegotiation at twenty-five year intervals. If the parties failed to agree on a "reasonable" rent, the amount was to be set by the New York courts. We know of no tax that is subject to negotiation between the taxpayer and the sovereign to set its rate or that provides for its rate to be determined by the courts. Nor is a tax normally the subject of a consensual agreement between the taxpayer and the sovereign. The voluntary entry by Amtrak's predecessors and the City into the agreements counsels against interpreting the payments as taxes.

The payments in question fit precisely within the meaning of non-tax fees developed in *National Cable.* They are voluntary payments made to the City in return for a benefit, the use of City property, received by Amtrak. Amtrak's status as a congressionally created entity does not change the nature of the payments due.[2]

Amtrak argues, however, that the nature of its relationship to the City is no longer truly voluntary, as Congress has required that Amtrak supply service to the City, as well as the entire "Northeast Corridor." *See* 45 U.S.C. §§ 502(5), 521 (1982). We agree that Amtrak's relation to the City is not the same as the relation that existed when Amtrak's predecessors and the City signed the certificates. However, this fact does not control the outcome of this dispute. That Amtrak may have less leverage than its predecessors in negotiating the amount of rent due under the certificates is no reason to classify the rent as something it is not: a tax.

We find no reason to construe the payments due to the City under the 1902 and 1907 certificates as anything other than rent, *i.e.,* payments for the benefit of Amtrak's use of City property. Therefore, Amtrak is not exempt from making these payments to the City under section 546b.

The district court properly granted summary judgment to the City. There is no genuine issue of material fact. The facts presented by the parties in their joint statement compel the conclusion that Amtrak is not exempt from the payments at issue. Considering the facts, and the inferences to be drawn from them, in the light most favorable to Amtrak, we conclude that the district court's decision should be affirmed.

## CONCLUSION

Section 546b exempts Amtrak only from the payment of state and local taxes and fees that are the equivalent of taxes. The payments owed to the City by Amtrak under the 1902 and 1907 certificates are rent, and do not fall within the exemption for taxes as contemplated by Congress. Amtrak therefore is not exempt from payments required under the certificates. The order of the district court is affirmed.

---

**2.** We note that under our analysis, we need not determine whether the three-prong test of *Massachusetts v. United States,* 435 U.S. 444, 466–67, 98 S.Ct. 1153, 1166–67, 55 L.Ed.2d 403 (1978), cited by the district court, 695 F.Supp. at 1575, applies to this case. The intent of Congress and the nature of the payments contemplated in the certificates clearly require that Amtrak make the payments demanded by the City. Similarly, because this case involves consensual payments made in exchange for the use of real property by Amtrak, we have no occasion to consider

whether the Third Circuit's reasoning in *National Railroad Passenger Corp.,* 848 F.2d 436, would lead to a different result. In that case, the court concluded that a nonconsensual assessment on Amtrak intended to partially fund construction of a bridge was an assessment for a local improvement from which Amtrak was exempt. In contrast, the circumstances presented to us so clearly concern an area not within the parameters of section 546b that it is unnecessary to consider the federal tax immunity rules considered by the Third Circuit.